Lolita S. Armour, Petitioner, v. Commissioner of Internal Revenue, Respondent.

Docket Nos. 88151, 93150. Promulgated April 5, 1940.

*Alexander F. Reichmann, Esq.,* and *R. W. Burgeson, Esq.,* for the petitioner.

*F. R. Shearer, Esq.,* and *F. F. Korell, Esq.,* for the respondent.

778

## OPINION.

MELLOTT: The issues are substantially the same in each proceeding. In the statements attached to the deficiency notices respondent relied upon the provisions of sections 166 and 167 of the Revenue Acts of 1932 and 1934 in support of his determinations that the income of the 1931 trust was taxable to petitioner. In each of the petitions the inclusion of said amounts is alleged to be erroneous. These allegations were denied in respondent's answers and amended answers. In his amended answers, respondent made certain affirmative allegations, among others, that he had erred in not including in gross income the amounts paid as agent's commissions and compensation. These allegations were specifically denied by petitioner in her replies.

Respondent contends that the distributions of $10,000 per month to petitioner's daughter were "sums paid pursuant to an agreement between the petitioner and her daughter that was made prior to December 30, 1931,  *  *  *"; that the trust instrument of that date is "a trust to secure or discharge the performance of either an antecedent obligation that the petitioner. was under, or a duty that she then

owed to her daughter;" and that the income, which the petitioner is shown to have used and which her daughter accepted in payment and satisfaction of the petitioner's indebtedness to her, is taxable to the petitioner without regard to whether she extracted it from a technical trust, allegedly created on December 30, 1931, or directly from her own private funds.

The respondent cites and relies upon *Douglas* v. *Willcuts*, 296 U. S. 1, and related cases, which hold that where a trust is created by a settlor as a channel for the application of the income to the discharge of his legal obligation, duty, or indebtedness, the income so used must be treated as his income and taxed to him because he "enjoys the benefit of the income as though he had personally received it." See also *Helvering* v. *Fitch*, 309 U. S. 149; *Helvering* v. *Blumenthal*, 296 U. S. 552, reversing 76 Fed. (2d) 507; *Helvering* v. *Stokes*, 296 U. S. 551; *Helvering* v. *Schweitzer*, 296 U. S. 551; *Commissioner* v. *Grosvenor*, 85 Fed. (2d) 2; *Thomas* v. *Commissioner*, 100 Fed. (2d) 408; *Louis W. Hill*, 33 B. T. A. 891; affd., 88 Fed. (2d) 941; cf. *Jay C. Hormel*, 39 B. T. A. 244, and cases cited (on appeal C. C. A., 8th Cir.); *Herbert G. Goulder*, 39 B. T. A. 670 (on appeal C. C. A., 6th Cir.); and *Alfred C. Berolzheimer*, 40 B. T. A. 645 (on appeal C. C. A., 2d Cir.).

Petitioner argues that the above contention raises an entirely new and affirmative issue, injected into the proceedings for the first time in respondent's brief, and that it can not be considered by this Board. She also contends that if this issue had been properly raised, the burden of proof would have been upon the respondent. No extended discussion of the burden of proof needs to be made. The pleadings indicate that the issue was raised. In paragraph 6 of the amended answers it is alleged upon information and belief:

* * * that the entire income realized upon the assets listed in the document executed by the petitioner on December 31, [30], 1931, *was used by the petitioner during the calendar years* * * * *for her own use and benefit.* [Italics supplied.]

This was specifically denied in the reply. Regardless of who had the burden of proof, the conclusion would be the same; for the evidence is insufficient to show that any part of the income was used for petitioner's benefit.

Reviewing the evidence briefly, petitioner and her daughter had pledged properties of great value in 1923 when Armour was in financial difficulty. These properties had been given to them by him in prior years. Under the terms of the pledge agreement all income from the collateral pledged by others than Armour was to be paid to such others from time to time as it accrued, unless there was a default in the payment of his indebtedness or obligations to Armour

& Co. of Delaware, or Armour & Co., an Illinois corporation. Petitioner's daughter testified that she never received any income from the properties pledged by her after she signed the 1923 agreement. At that time she had no substantial independent income of her own. Petitioner, however, had income from stocks and bonds which she had inherited from her father, amounting to approximately $200,000 per annum. In May 1928 there was a final settlement between Armour's estate and his creditors, as a result of which all of the securities pledged by petitioner and her daughter were taken and absorbed by the creditors of Armour.

The findings show in detail the facts relative to the purchase by petitioner from her husband of the stock of the Universal Oil Products Co. In 1926, when petitioner began to receive large dividends on this stock, she began to make payments in substantial amounts to her daughter. They were irregular in time and amount until April 1929, when she directed her bank to pay the daughter $10,000 per month. In January of 1931, when petitioner sold the stock for $9,500,000, she decided to set up a trust that would insure the receipt by her daughter of an income of $10,000 a month during her lifetime. The evidence justifies the conclusion that in creating the trust for the benefit of her daughter petitioner was motivated by a desire to insure the receipt by the daughter of adequate income for her support, maintenance, comfort and well-being, and also by a desire to reimburse her daughter, in part, for the financial sacrifice which she had made in coming to the aid of her father during the time of his financial distress. It indicates that she intended to put into the trust, property which would provide her daughter with substantially the same amount of income that she had been receiving prior to the pledge for her father's benefit and about the same amount that petitioner had been sending her, namely, $10,000 per month; and when it became apparent in February 1932, that the property might not be sufficient to provide that amount of income, she instructed her bank to make up any deficiency from her personal accounts.

Respondent's position seems to be that sometime between 1923, when the pledge agreement was executed, and December 30, 1931, when the trust was created, petitioner became *legally* obligated to pay the daughter $10,000 per month and that the trust was created for the purpose of providing a source and security for the payment of this obligation. The evidence does not justify such conclusion. Petitioner admitted quite frankly that she felt that she had a *moral* obligation to her daughter. When this testimony is considered in connection with other testimony to the effect that she and her daughter had "always been very close;" that the family was "closely

knit"; that petitioner was wont to respond promptly and generously to all family needs; and that the daughter considered petitioner's response to her needs as "a very marvelous thing to do", the conclusion seems to be inescapable that the trust was not established as a result of any *legal* obligation.

Respondent attempted to show and now argues that the obligation to pay $10,000 per month was created on February 23, 1923. He states that when the daughter pledged her securities it was necessary that she be given some assurance she would be provided with enough money for her support during the period that her securities remained subject to the pledge, and that petitioner gave her such assurance by entering into an arrangement to pay her an allowance of that amount. He also states that Armour and the petitioner had manifested their intention to make full restitution to any of the relatives who might sustain a loss by reason of their having pledged securities to secure the payment of Armour's liabilities; that the petitioner's daughter, as a matter of course, knew of her parents' intention to protect the pledgors from any loss; that it is inconceivable either of them would have permitted her to place herself in a position of dependence without having given some assurance for her future support; and that if such assurances were given they were legally binding upon Armour and petitioner, jointly and severally.

Counsel for respondent points to excerpts of testimony which he contends supports this view. He refers to the daughter's testimony to the effect that her mother "wanted to try to reimburse me for what I had done for father"; to her affirmative answer to this question asked by him: "And the restitution or repayment about which both you and your mother have spoken relates to an arrangement to treat you the same way that you had helped *others* [her]—to treat the other sureties of your father, is that right?" and to the fact that shortly after the settlement under the pledge agreement the petitioner began paying the daughter substantial amounts monthly. He asks a finding to the effect that the daughter's "acceptance of her mother's promise to pay her $10,000 a month in 'repayment', 'reimbursement,' 'settlement' and 'restitution' for her losses, constituted an implied understanding on the part of the daughter * * * that she would not proceed against her mother * * * or her deceased father's estate on any claim * * * [particularly for] * * *

(a) Violation of a fiduciary relationship;

(b) Liability arising out of the February 23, 1923, transaction;

(c) Liability arising out of petitioner's dealings with her husband or his creditors to her advantage over the co-pledgors; and

(d) Liability arising out of the May 6, 1928, transaction."

The suggested finding—or mixed finding and conclusion—can not be made. The evidence does not indicate that it was necessary to give the daughter any assurances at the time she pledged her property or that any assurances were given; nor can it be found as a fact that petitioner gave her such assurances by "entering into an arrangement" to pay her an allowance. Moreover, the evidence does not support the statement that Armour and the petitioner manifested their intention to make full restitution to relatives who sustained losses by reason of their pledges. It may be of some significance that petitioner did not begin making substantial payments to the daughter until 1926. Armour, it will be recalled, was alive until 1927. Whether he contributed to her support in the interim or whether she was supported by her own husband was not shown. But, however that may be, the evidence clearly indicates that petitioner did not feel herself to be *legally* obligated to the daughter nor did the daughter feel that any such obligation existed. When petitioner's income from dividends on her Universal Oil Products Co. stock became substantial in 1926, she decided to make some payments to her daughter and did so, at irregular intervals, until April 1929, when she made an arrangement *with her bank* to pay her $10,000 per month. She advised her daughter of this voluntary arrangement that she had made for her benefit and in 1931 informed her that she was taking steps to perpetuate such payments. We do not share the respondent's view that a mother, the owner of stock paying unusually large dividends, would not share her prosperity with her only child, an adult, married daughter, unless there was some existing liability or legal obligation which compelled her to do so. While the making of such payments by one other than a parent might carry with it an implication of a legal obligation, no such implication is justified under the present record.

It would unduly lengthen this opinion to mention and discuss every argument made by counsel for the respondent that the payments were made to satisfy a duty, legal obligation, or indebtedness of the petitioner, and that the trust instrument was executed in fulfillment thereof. We are of the opinion that what petitioner did was purely voluntary and gratuitous; that she was motivated solely by a desire to insure her daughter's future; and that she was under no more than a moral obligation to reimburse her for the losses she had sustained in coming to the aid of her father. The rationale of *Douglas* v. *Willcuts*, *supra*, and related cases therefore has no application.

But should the income be taxed to petitioner upon the theory that the forty-eight $10,000 monthly payments were made pursuant to

a promise which petitioner had made to her daughter that she would make future gifts to her in such amounts? Respondent so contends, citing *Housman* v. *Commissioner*, 105 Fed. (2d) 973; certiorari denied, 309 U. S. 656, affirming *Stella S. Housman*, 38 B. T. A. 1007.

In the cited case, the question was whether the petitioner was liable for gift tax as a result of certain payments made to her son. Her deceased husband by his will had established two separate trusts, of $250,000 each, for the benefit of his two sons. The residue of his estate was left in trust for his widow, she to receive all the income therefrom for life and the remainder to go to the sons. The testator died in 1913 and one of the sons died in 1924. Several years later the other son became discontented and threatened to try to break the father's will, demanding one-third of the estate's income. The mother expressed her willingness to pay him a substantial amount of the estate's income, and he agreed to accept such payments. It was urged that the transaction was a binding contract; that the petitioner's promise to make the payments was supported by the son's relinquishment of his claims; and that her payment in 1933 was not a gift, since it was made in performance of an obligation which she could not have avoided.

Affirming the decision of this Board, the court held that the transaction was not a contractual one and imposed no enforceable obligation on the mother; that there was no compromise of a bona fide will contest; and that the mother's expression of a willingness to pay her son a certain part of the estate's income resulted from the kinship between the payer and receiver. "It was essentially donative in character, a promise or agreement to make gifts in the future." The dissenting opinion expressed the view that the dealings between the mother and son resulted in a contract between them, based upon a good consideration, and that the payments were improperly determined to be gifts.

The *Housman* case is distinguishable upon its facts. The question here is not whether forty-eight payments of $10,000 per month should be included in petitioner's income but whether the income from the trust, exclusive of tax-exempt income, should be included. The income amounted to $112,542.79 in 1932, $62,799.28 in 1933, $94,900.95 in 1934, and $112,354.30 in 1935. In the *Housman* case the payments were made by the mother to her son out of the income payable to her under a trust created by her husband for her benefit. In the instant proceedings the payments were made, not by petitioner, but by a trust which she had created for her daughter's benefit. It can not be held that petitioner personally made gifts to her daughter

of $10,000 per month merely because she created a trust for her benefit which paid her substantially that amount. We do not intimate that the amounts paid by the petitioner directly to her daughter or used to augment the income of the trust did not constitute gifts; but that question is not before us.

The next contention of the respondent, and the theory upon which the deficiencies were determined, is, that if it is assumed that the technical legal title to the property described in the trust instrument passed from the petitioner to herself as trustee and that a valid trust was created, she nevertheless is taxable on the income in question because she reserved the power to revoke the benefits granted to her daughter. The Revenue Act of 1932 provides:

SEC. 166. REVOCABLE TRUSTS.

Where at any time during the taxable year the power to revest in the grantor title to any part of the corpus of the trust is vested—

(1) in the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom, or

(2) in any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom,

then the income of such part of the trust for such taxable year shall be included in computing the net income of the grantor.

Section 166 of the Revenue Act of 1934 is the same except that the clauses "during the taxable year" and "for such taxable year" are omitted.

The respondent's position is that, notwithstanding the provision of article VII of the trust instrument in which the grantor expressly stated "that she does not desire to retain, and has not retained, any power to change the terms of or revoke the trust", petitioner reserved the power, in article III of the trust instrument, to regain at any time whatever she may be held to have granted to her daughter by way of benefits, without leaving the daughter any legal or equitable recourse. Article III provides:

Commencing with the date hereof, said Trustee shall pay and use the net income from said trust estate, and such portion or portions of the principal of said trust estate as, in the absolute discretion of the Trustee, may be necessary or desirable for the support, maintenance, comfort and well-being of LOLITA ARMOUR MITCHELL, daughter of the undersigned, for and during the term of the natural life of the said LOLITA ARMOUR MITCHELL, *or until such time prior thereto when the entire principal of said trust estate* shall have been either used or expended for that purpose, *or shall have been exhausted by the purchase of annuities for the benefit of and/or life insurance upon the life of said* LOLITA ARMOUR MITCHELL, *as hereinbefore provided.* [Italics ours.]

Respondent urges that the practical effect of the language in italics is that petitioner declared her property should remain sub-

ject to the terms of the trust instrument until she elected to exercise the rights and powers reserved in article II, and that she therefore had the right to terminate the trust and revest the corpus in herself at any time.

The dominant purpose of the trust was to provide income for petitioner's daughter for life. The only proviso for the return of any part of the corpus or income to petitioner is contained in article IV. Under it petitioner or her estate was to receive, upon the death of the daughter, the entire trust estate and income therefrom which the trustee then had in her possession. It will be noted that this article does not provide that upon the death of the daughter "*or prior termination of the trust*" the corpus shall revest in the settlor; and it seems reasonable to assume she would have inserted the quoted sentence or words of similar import if she had had any intention of reacquiring any part of the corpus prior to her daughter's death, that is, by a mere "termination of the trust."

When article III is read in conjunction with article IV, the conclusion seems to be inescapable that the trust would have terminated upon the happening of either of two events, viz., (1) the death of the daughter, when the purpose of the trust would have been fulfilled, or (2) the distribution of the entire principal to the daughter, which distribution the trustee was empowered to make in her discretion. A reasonable interpretation of the trust seems to be that it would not have terminated by the exercise by the trustee of the power given her "to use the whole or any part of said trust estate for the purchase of either a policy or policies of insurance upon the life of her said daughter  *  *  *  or a life annuity or annuities for her said daughter; and/or a combination of life insurance  *  *  *  and annuities for her said daughter", unless such policies or annuity contracts were distributed to the daughter. In the absence of such a distribution any policies or annuity contracts purchased would have to be retained by the trustee as part of the corpus of the trust, and the income therefrom would of necessity have to be distributed to the beneficiary. Article III does not appear to have been inserted for the petitioner's benefit, but is a statement of the benefits petitioner intended for her daughter.

In the recent case of *Helvering* v. *Wood*, 309 U. S. 344, the Supreme Court pointed out Congress "whether wisely or not  *  *  *  has confined sec. 166 to trusts where there was a 'power to revest.'" Referring to the fact that there was "no apparent or lurking ambiguity" in the section, the Court held that it was neither required nor permitted "to divine a broader purpose than that expressed." The question in the instant proceedings upon this issue then, is the narrow one, Did the petitioner have the power to

revest in herself title to any part of the corpus? Being of the opinion this question must be answered in the negative, it is held that the income of the trust is not taxable to petitioner under section 166.

Is the income taxable to petitioner under section 167? This section is as follows:

SEC. 167. INCOME FOR BENEFIT OF GRANTOR.

(a) Where any part of the income of a trust—

(1) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income may be, held or accumulated for future distribution to the grantor; or

(2) may, in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income, be distributed to the grantor; or

\*    \*    \*    \*    \*    \*    \*

then such part of the income of the trust shall be included in computing the net income of the grantor.

(b) As used in this section, the term "in the discretion of the grantor" means "in the discretion of the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of the part of the income in question."

Respondent contends that "if the petitioner had caused the alleged trust to terminate prior to the death of her daughter by exercising the powers she excepted and retained in Article II of the instrument dated December 30, 1931, 'the entire trust estate    \*    \*    \*    including all income therefrom then remaining in the hands of the Trustee, or accrued but unpaid to the Trustee' becomes the property of the petitioner" and that "so long as petitioner's daughter received $10,000 a month from the petitioner from any source, she had no right to demand or receive any of the trust income."

It has been pointed out above that the trust could not be terminated prior to the death of petitioner's daughter unless petitioner, as trustee, distributed to her daughter its corpus and accumulated income. The provision respondent has quoted in the preceding paragraph is taken from article IV of the trust instrument wherein it is provided that *"Upon the death of the said* LOLITA ARMOUR MITCHELL, the entire trust estate then remaining, if any, including all income therefrom then remaining in the hands of the Trustee, or accrued but unpaid to the Trustee, shall be paid over, conveyed and delivered to LOLITA SHELDON ARMOUR, if living, and if she shall not be living, then the same shall be paid over, conveyed and delivered to the Executors \*    \*    \*    of said LOLITA SHELDON ARMOUR as such Executors." Under these circumstances it is apparent that if petitioner, as trustee, had used the whole or any part of the trust estate for the purchase of policies of life insurance on the life of her daughter or annuities for

the benefit of her daughter, petitioner could not have received income from such investments prior to her daughter's death. If, on the other hand, any part of the trust estate had been invested in nonincome-producing properties, there would have been no income to be received by her from this source.

We do not agree with respondent's statement that "so long as petitioner's daughter received $10,000 a month from the petitioner from any source, she had no right to demand or receive any of the trust income." Apparently it was the intention of the grantor that all of the net income of the trust, with the exception of capital gains, be distributed to her daughter; for the trust instrument provides in article I that the trustee is empowered "to invest and reinvest the principal and proceeds thereof", and in article III that "Commencing with the date hereof, said Trustee shall pay and use the net income from said trust estate, and such portion or portions of the principal of said trust estate as, in the absolute discretion of the Trustee, may be necessary or desirable for the support, maintenance, comfort and well-being of LOLITA ARMOUR MITCHELL * * * for and during the term of the natural life of the said LOLITA ARMOUR MITCHELL * * *." Petitioner's interpretation of the above quotation, though not binding upon us, is shown in her letter to the bank in which she instructed it to pay the daughter from her personal account "the difference between the income from her trust and ten thousand dollars."

A reasonable interpretation of the trust instrument, and especially of the provisions set out in the preceding paragraph, seems to be that the daughter, if she had seen fit to do so, could have compelled the distribution of the income of the trust, with the exception of the capital gains, to her; and it would require a strained construction to hold that the petitioner, in her discretion, could have held, accumulated, distributed, or used any of it in the manner set out in section 167.

Are the capital gains which petitioner as trustee accumulated during the years in question taxable to her under section 167 (a) (1), supra? Petitioner argues that the mere fact that capital gains are realized and added to the body of the trust res does not make such capital gains taxable to the settlor, citing Preston R. Bassett, 33 B. T. A. 182. In the cited case the taxpayer in 1929 had made an irrevocable gift in trust of certain shares of stock, naming himself as trustee. The instrument provided that the net income should be paid to the settlor's wife for and during the term of her natural life, and, at her death, that the trust should cease and the principal sum should revert to the settlor and his heirs. The taxpayer, as trustee, sold the stock at a profit shortly after the trust was created. This Board held that the capital gain realized on the sale was not income

taxable to him under section 167 of the Revenue Act of 1928, which provides as follows:

SEC. 167. INCOME FOR BENEFIT OF GRANTOR.

Where any part of the income of a trust may, in the discretion of the grantor of the trust, either alone or in conjunction with any person not a beneficiary of the trust, be distributed to the grantor or be held or accumulated for future distribution to him, * * * such part of the income of the trust shall be included in computing the net income of the grantor.

The basis of our decision was that the accumulation "came about through the operation of a general rule of law" that capital gain must be credited to the corpus of the trust unless the settlor shows a clear intent to the contrary. Our conclusion was that section 167, *supra*, could not be applied because the capital gain was not held or accumulated for future distribution to the settlor by reason of the exercise of any discretionary powers on his part. Cf. *Commissioner* v. *Waterbury*, 97 Fed. (2d) 383, affirming 33 B. T. A. 208.

The present issue is to be determined under the provisions of the Revenue Acts of 1932 and 1934. Section 167 of these acts taxes to the grantor not only that part of the income of a trust which in his discretion or in the discretion of any person not having a substantial adverse interest may be held or accumulated for future distribution to him, but also taxes to the grantor such part of the income of a trust as *is* held or accumulated for future distribution to him. Petitioner urges that this change in phraseology does not render the principle of the *Bassett* case inapplicable to the facts here involved, and states that no power, either discretionary or otherwise, is given to the grantor or the trustee, to hold or accumulate for present or future distribution to the grantor, the income of the trust or capital gains or increments to the trust *res*. This is not consistent with the statement made in her brief that "there was lodged in the trustee the power, in the trustee's discretion, to use any part or the whole of the trust *res*, including additions of increments or capital gains, for the support, maintenance, comfort, and well-being of the beneficiary, and hence there might well be nothing left to be distributed to or to revert to the grantor * * *." The quoted statement is, in our opinion, tantamount to a concession by petitioner that she had the discretion either to distribute or accumulate capital gains and, even under the rationale of the *Bassett* case, they would be includible in her income irrespective of the change in the statute.

Regardless of any discretionary power vested in the trustee with respect to the capital gains, the changed phraseology of the later acts necessitates their inclusion in petitioner's income if they were being held or accumulated for future distribution to her. We know that the trust realized capital gains; that these gains were retained by it and

not distributed; and that for Federal tax purposes they constitute accumulated income. There remains only the question of whether they were being held for future distribution to petitioner. It is true, as petitioner points out, that she, under the terms of the trust instrument, might have used the entire trust estate, including the capital gains, for the support, etc., of her daughter, and thus left nothing to revert to her. But no such intention is manifested by her acts as trustee during the taxable years. Under the arrangement in effect during these years, namely, that any deficiency in trust income would be supplied from her personal funds rather than from the trust corpus or capital accretions, the probability that any part of these accumulated gains would ever be distributed to petitioner's daughter, who had only a life interest, was quite remote. The only other person who could benefit from their accumulation was the petitioner, the owner of the reversionary interest. It is reasonable to conclude, under the circumstances, that they were being accumulated for future distribution to her. We hold therefore that respondent did not err in including these capital gains in petitioner's income under the provisions of section 167 of the Revenue Acts of 1932 and 1934. Cf. *Everett D. Graff*, 40 B. T. A. 920.

Were the interests and powers of control which the petitioner excepted and retained over the economic benefits of the property transferred to herself as trustee of such a substantial character that she, for income tax purposes, must be regarded as remaining in substance the legal owner of the property and taxable on its income under section 22 (a) of the applicable revenue acts?

An owner of property can not relieve himself of income tax on the income produced by it by assigning the income to another. *Lucas* v. *Earl*, 281 U. S. 111. This rule has been applied to assignments of partnership profits to a third person not a member of the partnership, *Burnet* v. *Leininger*, 285 U. S. 136; to assignments of dividends on stock, *Fred W. Warner*, 5 B. T. A. 963; and to assignments of rents from real estate, *Bing* v. *Bowers*, 22 Fed. (2d) 450; affd., 26 Fed. (2d) 1017. "Liability may rest upon the enjoyment by the taxpayer of privileges and benefits so substantial and important as to make it reasonable and just to deal with him as if he were the owner, and to tax him on that basis", *Burnet* v. *Wells*, 289 U. S. 670. Upon this theory the Board, in some instances, has taxed the income of "short term trusts" to the grantor. *Estate of A. C. O'Laughlin*, 38 B. T. A. 1120; *Benjamin F. Wollman*, 31 B. T. A. 37; and *William C. Rands*, 34 B. T. A. 1107.

Since the filing of briefs herein the Supreme Court has had occasion to review this question at length in *Helvering* v. *Clifford*, 309 U. S. 331. It held that the creator of a "short term" trust, for the alleged benefit of his wife, but who had the "absolute

discretion" to determine when the payments should be made to her, to exercise all voting powers incident to the trusteed shares of stock, to sell, exchange, mortgage or pledge the securities and income upon such terms and for such consideration as he in his absolute discretion might deem fitting, and several other similar powers, remained in substance the owner of the property and taxable upon the income. It was pointed out that the trust "did not effect any substantial change" in the settlor's dominion and control over the property; that, at best, there was but "a temporary reallocation of income within an intimate family group"; that since the income remained in the family and the husband retained control over the investment he had "rather complete assurance that the trust will not effect any substantial change in his economic position"; and that, notwithstanding the execution of the trust, he "retained the substance of all the rights which previously he had in the property." We are in accord with these views. They constituted the basis upon which we had reached the same conclusion when the case was before us. But we are of the opinion that the conclusion reached in that case is not justified under the evidence in the instant proceedings. The powers retained by this petitioner were not as great as those retained by the settlor in the cited case; the trust was not for a "short term", but for the lifetime of the daughter; the beneficiary, though closely bound to the settlor by ties of blood and affection, had established her own home and family ties and the family intimacy was not as great as that between husband and wife.

In *Helvering* v. *Clifford, supra,* the Court said that the answer to the question whether the settlor did or did not remain, in substance, the owner of the property "must depend on an analysis of the trust and all the circumstances attendant on its creation and operation." Making such an analysis, it will be noted that the trust effected a substantial change in petitioner's economic position. It was not established primarily as a tax-saving device, but in good faith to provide for the support of a daughter who had sacrificed the major portion of her substantial property to aid her father in his financial difficulties. All indications are that petitioner intended to deprive herself of the economic benefits in the property for an indefinite period; and near the close of the year 1935 she surrendered the reversionary interest, which she had theretofore retained. Under the circumstances it can not be held that petitioner remained, in substance, the owner of the property giving rise to the income in question.

The remaining argument of the respondent in support of his contention that the income of the trust is taxable to petitioner is that she retained the right to invest corpus and income for her own benefit. He urges that even though the substantial interests which produce the income to be taxed are transferred, the transferor of the

property remains liable for tax on the income if he uses it for his own benefit or retains the right to appropriate it, regardless of whether he actually exercises such power. *Corliss* v. *Bowers*, 281 U. S. 376; *Burnet* v. *Wells, supra; Douglas* v. *Willcuts, supra.*

Respondent argues that the powers enumerated in article II of the trust instrument were reserved by petitioner in her individual capacity; and that, inasmuch as she was given the power "to use the whole or any part of said trust estate" in the purchase of property to be held as an investment, she had the power to use both corpus and trust income in the purchase of nonincome-producing property and thus nullify the provisions of article III providing that the trustee pay and use the net income for the support, maintenance, comfort, and well-being of her daughter. This argument probably should have been advanced in connection with the applicability of sections 166 and 167, *supra;* but since the respondent has chosen to treat it separately we shall do likewise.

The provision relied upon by the respondent authorized petitioner, *"as Trustee"*, to make such purchases. This seems to indicate that in making such investments petitioner would necessarily be acting as fiduciary rather than in an individual capacity. Moreover, the evidence indicates that the provision was inserted because, at the time the trust was created, there was fear of inflation. Its purpose was, as set out in the findings, to permit the trustee to make investments as a "hedge" against inflation if she deemed it necessary. The fact that no such investments were made during the four years in issue tends to support the conclusion reached.

The parties are in hopeless disagreement as to the meaning of the term "trust estate" as used in article II. Respondent contends that it comprehends both corpus and income, while petitioner contends that it refers only to corpus. A decision upon this question is necessary because, if respondent's contention is correct, the provisions of article II afford petitioner a method of accumulating the income for her own benefit. The term as used in the trust instrument is not free from ambiguity. Article I contains the statement: "If there be any uncertainty or question as to whether any part of said trust estate be principal or income", the trustee, in her discretion, is "to settle and determine such question." This, standing alone, would seem to indicate that petitioner intended to include both principal and income. In article III, however, the settlor speaks of the "net income *from* said trust estate" and "the entire principal *of* said trust estate", while article IV states, "the entire trust estate then remaining, if any, including all income therefrom." The latter statements seem to indicate that the term includes only the corpus.

Where an ambiguity exists the intention of the settlor may be ascertained from oral statements both before and after the execution of

the declaration of trust (65 C. J. 601), and from the conduct of the parties affected by the instrument in their performance under it (65 C. J. 502). See also *Herbert G. Goulder, supra; Phebe Warren McKean Downs,* 36 B. T. A. 1129; *Baird* v. *United States,* 3 Fed. Supp. 947; affd., 65 Fed. (2d) 911; *Old Colony Trust Co.* v. *City of Omaha,* 230 U. S. 100. The petitioner testified that in the execution of the trust she had no motive or purpose other than to provide a substantial income from investments for her daughter's maintenance the rest of the daughter's life. She also testified that in her discussion with her attorney, and in directing him in the preparation of the trust instrument, she told him that her purpose was to provide for her daughter's maintenance; that she wanted the trust fund to be invested in the best manner possible to produce the largest income; and that it was "for my daughter absolutely, for my daughter alone." The attorney testified that petitioner told him she wanted to establish a trust to make her daughter independent financially and to secure her, so that whatever should happen to petitioner or her fortune, the daughter would always have at least that income for her support and maintenance. This evidence, together with the payments actually made, tends to support petitioner's contention that the term "trust estate" as used in article II referred only to the corpus of the trust.

The provisions of article II should be construed in harmony with, and to make effective, the dominant purpose of the trust, i. e., to provide and pay income to the beneficiary for life. So construed, it can not be said that they authorized or permitted the trustee to invest the income of the trust in property of any kind and thus accumulate it, nor that they authorized the investment of the whole of the trust estate permanently in nonincome-producing properties. In our opinion a court of equity, on the request of petitioner's daughter, would have restrained petitioner from making any such permanent investments of this type because to do so would operate to nullify, and indirectly revoke, the trust, in the face of the express provision that it should be irrevocable.

The respondent erred in including in petitioner's gross income for the years in question the ordinary income of the trust. He did not err in including the capital gains.

The remaining issue relates to the deductibility of agent's compensation and commissions claimed by petitioner in her returns for the years 1932 to 1935, inclusive. The evidence does not show that petitioner was engaged in carrying on a trade or business. On the authority of *Helen W. Heilbroner,* 34 B. T. A. 1200, and cases therein cited (affd., 100 Fed. (2d) 382), it is held that petitioner is not entitled to the deductions claimed.

*Judgment will be entered under Rule 50.*